IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,   CASE NO. 8:23-CR-00109-WFJ-MRM-1
vs.

YUENDRY RODRIGUEZ-HILARO,
    Defendant.
_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

    COMES NOW, the Defendant, YUENDRY RODRIGUEZ-HILARIO, by and through his undersigned counsel, pursuant to Middle District Rule 3.01 and the Sixth Amendment of the United States Constitution, and files this Sentencing Memorandum. The undersigned believes

**FACTS RELATING TO CHARGED CRIMINAL OFFENSE.**

    1. On or about March 30, 2023, the Government filed an Indictment against Defendant. (Doc. 25).

    2. On or about October 23, 2023, the Government filed a three-count Superseding Information against Defendant. (Doc. 54).

    3. The Superseding Information charged Defendant with the following counts: I). Conspiracy to Possess Firearms in Furtherance of Drug Trafficking in violation of 18 U.S.C. Sec. 924 ( c) (1)(B)(ii) and (o); II). Aiding and Abetting the Possession of Firearms in Furtherance of a Drug Trafficking Case in violation of 18 U.S.C. Sec. 924 (c )(1)(A)(i), and 2, and III). Aiding and Abetting the Concealment of Money Laundering in violation of 18 U.S.C. Sec. 1956(a)(1)(B)(i), (3)(B), and 2.

    4. On or about November 1, 2023, Mr. Rodriguez-Hilario pled guilty pursuant to a plea agreement with the government.  (Doc. 58).

    5. Mr. Rodriguez-Hilario's sentencing is scheduled for March 29, 2024.

      6.     The PSR in this case calculates Mr. Hilario-Rodriguez's total offense level as 31 with a criminal history of II.  (PSR at Para. 51, 56).  Accordingly, Mr. Hilario-Rodriguez is facing a sentencing range of 121 months to 151 months.  Count II requires a minimum term of imprisonment of 5 years.  The term of imprisonment on Count II must be imposed consecutively to any other counts. (PSR at Paras. 85, 86).

      7.     Mr. Hilario-Rodriguez's sentence should be reduced for the following reasons below.

## DEFENDANT'S BACKGROUND

Mr. Hilario-Rodriguez was born on July 27, 1994, in Nagua, Maria Trinidad Sanchez, in the Dominican Republic.  This part of the Dominican Republic is an agricultural part of the island that houses many people living in poverty.  There have been several kidnappings in this area within the past five years.  Most of the people in this area have electricity but roughly only 28 percent have working internet (According to Global Date Lab).  According to the World Bank, about 94.9 percent of the residents in this area are below the International Poverty Line.  Most people in this area aspire to leave the Dominican Republic.  Also, most people in this area earn their money by either playing baseball or turning to illegal means to earn currency for their families.

Mr. Hilario-Rodriguez was one of two children born to his mother, Yanet Hilario.  Mr. Hilario-Rodriguez has a half-brother, on his paternal side (father being Eladio Rodriguez).  He also has a half-sister on his maternal side named Yandery Yanilsa Hernandez.  Mr. Hilario-Rodriguez's parents were separated when he was a child. Mr. Hilario-Rodriguez grew up in the Dominican Republic until 2011 (he was 16 years old).

Mr. Hilario-Rodriguez's childhood was far from stable. During the time he was living in the Dominican Republic, Mr. Hilario-Rodriguez was raised primarily by his maternal grandmother. Mr. Hilario-Rodriguez's mother worked in another town and was absent for most of this portion of Mr. Hilario-Rodriguez's life. She then moved to the United States leaving her son behind in the Dominican Republic.

Mr. Hilario-Rodriguez's father was never active in his son's life. The father chose a life of alcohol, chasing women, cheating on Mr. Hilario-Rodriguez's mother, and pursuing his own wants and desires over raising his two sons. Mr. Hilario-Rodriguez never had any guidance, discipline, or structure from his father.

In 2011, Mr. Hilario-Rodriguez moved to Orlando, Florida. He moved there to join his mother who had left the Dominican Republic sometime prior. The family then moved from Orlando, Florida to Cleveland, Ohio where some of Mr. Hilario-Rodriguez's siblings resided.

While in Cleveland, Ohio, Mr. Hilario-Rodriguez attended high school. He also played on the baseball team. During this time, coaches and scouts quickly saw Mr. Hilario-Rodriguez had a special gift in his right arm. Mr. Hilario-Rodriguez was a pitcher and had a special talent for the velocity he could achieve in throwing a baseball. During the summers after school, Mr. Hilario-Rodriguez would return to the Dominica Republic and play down there.

In 2013, Mr. Hilario-Rodriguez signed with an international players' scout. He signed with the Julio Cesar Franco Academy in the Dominican Republic. Julio Cesar Franco was a past major league baseball player who had not opened a "baseball academy" to sign (possess the rights) certain young prospects with the promises of major league contracts. Mr. Franco of course would ensure he was entitled to a portion of any of "his players" future incomes.

Mr. Hilario-Rodriguez attended this academy in 2012. Around this time, he began having pain in his right shoulder. The administration at Julio Franco Academy cut Mr. Hilario-Rodriguez from his contract. Mr. Hilario-Rodriguez then joined the Manny Acta Academy. Unfortunately, Mr. Hilario-Rodriguez started to experience excruciating pain in his right shoulder and could no longer pitch like he once could. Mr. Hilario-Rodriguez's baseball career came to a crashing end. This resulted in Mr. Hilario-Rodriguez engaging in consuming alcohol at the young age of 17. Mr. Hilario-Rodriguez consumed alcohol consistently to battle the demons from his baseball injury and other obstacles in his life.

In 2013, Mr. Hilario-Rodriguez knew he had to do something to earn some money. He already was a father, as he and Ms. Wanda Diaz had a daughter in 2012 (Yenderly Rodriguez Female born August 2012). Mr. Hilario-Rodriguez and his daughter returned to the United States. In 2013, Mr. Hilario-Rodriguez achieved in obtaining his G.E.D. at the Spanish American Committee (a/k/a Centero Hispano) in Cleveland, Ohio. Mr. Hilario-Rodriguez enrolled in Barber College. He was in average scholastic and attendance when he decided to not continue to try to give baseball another chance. This second attempt at baseball failed as well.

In 2015, Mr. Hilario-Rodriguez started a relationship with Ashley Barrio. This relationship produced Mr. Hilario-Rodriguez's second child, a son, named Yendry Rodriguez (born in 2017). This child lived and lives in Cleveland, Ohio. During this time, Mr. Hilario-Rodriguez raised both of his children the best he could. He had his first child, his daughter living with him, and his second child, his son, living in the same city. Although he and the mother of the second child were not together, Mr. Hilario-Rodriguez still ensured to provide for this child the best he could. At this time, Mr. Hilario-Rodriguez worked as a valet in a parking service. He earned $5.00 per hour plus tips. All of his money went toward his children and living expenses.

In 2019, Mr. Hilario-Rodriguez knew he had to earn more money. He took a job working for a tree and landscaping business. He earned about $21.00 per hour but had to quit the job because of the excruciating pain in his right shoulder.  In 2019, Mr. Hilario-Rodriguez worked in Miami, Florida, as a barber. However, he could not afford to live as a family in Miami, Florida, and returned to Cleveland, Ohio.

In 2020, Mr. Hilario-Rodriguez married the mother of the first child.  This marriage was tough being the mother lived in the Dominican Republic and Mr. Hilario-Rodriguez lived in the United States. Mr. Hilario-Rodriguez feared for his wife's safety in the Dominican Republic, but she refused to leave.  Although the couple separated in 2021, they agreed the daughter should remain in the United States with her father.  During this time, Mr. Hilario-Rodriguez drove trucks and earned about $150.00 a day.  Mr. Hilario-Rodriguez would usually only work about 3 days a week due to the nation attempting to come out of COVID and work being slow with supply chain issues and reduced demand.

In 2023, Mr. Hilario-Rodriguez married Rayseli Rodriguez who resides in the Dominican Republic.  The couple have known each other since childhood.  Ms. Rodriguez became pregnant and unfortunately lost the child shortly after Mr. Hilario-Rodriguez's arrest in this matter.  Ms. Rodriguez remains in the Dominican Republic in a state of danger being Mr. Hilario-Rodriguez has attempted to provide substantial assistance.

At the time of his arrest, Mr. Hilario-Rodriguez was residing with his mother, daughter, and sister in Cleveland, Ohio.  Mr. Hilario-Rodriguez was contributing all of his money to the expense of the household and toward his child. Mr. Hilario-Rodriguez's mother is not in the best of health.  She suffers from high blood pressure and issues with her bones that restrict her movement and work.  Mr. Hilario-Rodriguez was also attempting to send money back to other family members, including his wife, from all monies he earned.

5

Since the time he was arrested, Mr. Hilario-Rodriguez has been incarcerated. Mr. Hilario-Rodriguez's health has taken a downward turn. He has had difficulty sleeping since his arrest, suffered from headaches approximately three times a week, and has stomach issues due to the food. During this time though, he has not moped and pouted. He has taken the opportunity to learn from his poor choice in being involved in this matter. Mr. Hilario-Rodriguez has completed numerous classes including Behavior Modification, Domestic Violence, Conflict Resolution, Life Skills, Anger Management, Drug and Alcohol, Parent Education, and Parenting Skills.

## **LEGAL ARGUMENT.**

### **Analysis Under the Advisory Sentencing Guidelines:**

The PSR, over objections, reflects a total offense level of 31 and a criminal history category of II. This range was calculated based on Mr. Hilario-Rodriguez not receiving a downward reduction for a minor role participant in this conspiracy.

> Section 3B1.2 provides for 2-, 3-, and 4-level decreases to the offense level, depending on the defendant's mitigating role in the offense, as follows:
>
> (a) If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.
>
> (b) If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
>
> In cases falling between (a) and (b), decrease by **3** levels. USSG §3B1.2.

The defendant bears the burden of proving by a preponderance of the evidence that he or she is entitled to a mitigating role adjustment. *See, e.g.*, United States v. Presendieu, 880 F.3d 1228, 1249 (11th Cir. 2018). Whether the defendant is entitled to a mitigating role adjustment, was a minimal or minor participant, or occupied a role falling between minimal and minor, is "heavily dependent upon the facts of the particular case." USSG §3B1.2, comment. (n.3(C)). Application Note 3(C) to §3B1.2 provides a non-exhaustive list of factors for the court to consider in determining whether to apply a mitigating role adjustment and, if so, the amount of the

6

adjustment. The note directs the court to consider: (1) the degree to which the defendant understood the scope and structure of the criminal activity; (2) the degree to which the defendant participated in planning or organizing the criminal activity; (3) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (4) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (5) the degree to which the defendant stood to benefit from the criminal activity. The Commentary also emphasizes that the mere fact that a defendant performed an "essential or indispensable role in the criminal activity" is not conclusive in determining whether to apply a mitigating role adjustment and that such defendant, if otherwise eligible, may receive a mitigating role adjustment.  Application Note 3(C) further provides, as an example, that "[A] defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered" for a mitigating role adjustment.  The Eleventh Circuit has instructed courts to consider "the defendant's role in the relevant conduct for which she has been held accountable at sentencing [and] her role as compared to that of other participants in her relevant conduct," as well as the "totality of circumstances" and the factors laid out in Amendment 794.  *United States v. Presendieu*, 880 F.3d 1228, 1249 (11th Cir. 2018)(*citing* United States v. De Varon, 175 F.3d 930, 940 (11th Cir 1999) (en banc)). *See also* United States v. Wright, 862 F.3d 1265, 1278 (11th Cir. 2017) (district court must "'determine that the defendant was less culpable than most other participants in her relevant conduct.'") (citations omitted).

In the case at hand, Mr. Hilario-Rodriguez asserts that he is a minor participant in this conspiracy. Mr. Hilario-Rodriguez admits that he was present for the brokering of the transfer of 92 firearms. Mr. Hilario Rodriguez was part of a conspiracy involving a person in the Dominican Republic and co-defendant, Mr. Saleh Yusuf Saleh ("Saleh") (Case No. 8:23-cr-00246). In September 2021, undercover agents were negotiating with a co-conspirator in the Dominican Republic for the purchase of guns. The agents were directed to an address in Cleveland, Ohio. This is where the agents met with Mr. Hilario-Rodriguez.

When the agents arrived, Mr. Hilario-Rodriguez gave the phone to the agents who spoke with the co-conspirator in the Dominican Republic. This co-conspirator then approved the agents to deal with Mr. Hilario-Rodriguez. After this, the price was negotiated by Mr. Hilario-Rodriguez and the agents. No firearms were exchanged on this day.

In October 2021, the agents and a co-conspirator in the Dominican Republic continued to negotiate about a rocket launcher and other guns. Mr. Hilario-Rodriguez was not involved in these negotiations. Later on in October 2021, the agents met with a co-conspirator from the Dominican Republic in St. Petersburg, Florida. This meeting was for the delivery of 10 rifles along with multiple forearm magazines. The agents paid $18,000.00 for this delivery of firearms by the co-conspirator from the Dominican Republic and supplied by Mr. Saleh. He was able to buy the firearms legally for $300.00 and then resell them at increased prices. Mr. Hilario-Rodriguez did not deliver any firearms. Surveillance also indicated that after this purchase, the co-conspirator from the Dominican Republic was seen depositing into an account at the PNC Bank in St. Petersburg, Florida. Mr. Hilario-Rodriguez did not have any ownership or signing privileges on this bank account.

From January 2022 through March 2023, Mr. Hilario-Rodriguez admits that he negotiated the purchase of several firearms. Mr. Hilario-Rodriguez admitted this following his arrest in a post-*Miranda* long debriefing to law enforcement. In March 2023, Mr. Hilario-Rodriguez and Mr. Saleh met with the agents for the delivery of 40 firearms. These firearms were supplied by Mr. Saleh. Mr. Hilario-Rodriguez directed the agents to meet them at the Steelyard Commons in Cleveland, Ohio, and to separate $35,000.00 from the supply. While Mr. Hilario-Rodriguez was loading the firearms, he and Mr. Saleh were arrested.

Mr. Hilario-Rodriguez asserts he is a minor role participant in this conspiracy for several reasons. First, he was not the organizer, as he was the co-conspirator in the Dominican Republic. Second, he was not the supplier of any firearms, as the Government admits in the Plea Agreement, Mr. Saleh was the "source of supply for the firearms." Mr. Hilario-Rodriguez did not have a proprietary interest in this conspiracy as he had no "ownership, title, or control of the property." Mr. Hilario-Rodriguez was a middleman in that he negotiated with law enforcement for the purchase of firearms. He did so only after he was directed to meet law enforcement officers from the co-conspirator in the Dominican Republic. Mr. Hilario-Rodriguez also got his orders from the other conspirators, and he had no control over any inventory (guns) as that was Mr. Saleh.

Lastly, Mr. Hilario-Rodriguez was never seen in Florida. He never went to Florida and never once delivered firearms and received money in Florida. Mr. Hilario-Rodriguez did not have any bank accounts in his name; had no signing privileges to any bank accounts; never made any deposits; never withdrew any money; and was only paid by law enforcement. Mr. Hilario-Rodriguez was paid for performing certain tasks and that is negotiating for the purchase of these firearms and once to help Mr. Saleh deliver the firearms he supplied. All in all, the total sales price was about $79,500.00, of which Mr. Hilario-Rodriguez claims he was only paid $2,000.00 directly from the agents. [1] As a result, Mr. Hilario-Rodriguez requests a reduction for being a minor role participant.

**The Sentencing Guidelines Cannot Restrict a Court's Discretion**

a. **The Sentencing Guidelines Cannot Restrict a Court's Discretion**

A district court's discretion is no longer limited by the guidelines since its matrix is now considered merely advisory. *United States v. Booker,* 543 U.S. 220, 245-67. Indeed, it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).

It is abundantly clear that the district courts today enjoy "sizeable discretion" in sentencing. *United States v. Gall*, 552 U.S. at 56; *United States v. Pugh,* 515 F3d 1189-90 (11th Cir. 2008). Utilization of the Guidelines in a manner other than as an advisory tool violates the Sixth Amendment rights of a defendant. Any contention that the Guidelines enjoy a presumption of reasonableness has been rejected. *See Rita v. United States,* 551 U.S. 338, 351 (2007).

---

[1] This payment to Mr. Hilario-Rodriguez was not out of the sales proceeds ($16,000 +$28,500 +$35,000.00=$79,500.00).

A district court now has the ability and authority to impose a sentence, merely "because the case warrants a different sentence…," regardless of the range determined by a Guidelines calculation. *Id.* The only requirement is that a court consider the Guidelines as a factor along with the other factors delineated in § 3553 (a) before reaching its final decision. *Kimbrough v. United States*, 522 U.S. 85 (2007). No extraordinary circumstances need be present, or any mathematical formula be employed before a below Guidelines sentence may be imposed. *Gall,* 552 U.S. at 47-58. Judge Tjoflat, writing for the Court in *United States v. Glover*, 431 F.3d 744, 752-53 (11th Cir. 2005), recognized that in some cases, the Guidelines may have little persuasive effect in light of the § 3553 (a) factors.

Although 'judges must still *consider* the sentencing range contained in the Guidelines, that range is now nothing more than a suggestion that may or may not be persuasive…when weighed against the numerous considerations listed in [Section 3553(a)].' *United States v. Glover,* 431 F.3d 744, 752-53 (11th Cir. 2005).

Consistent with this, the Eleventh Circuit recently stated, "that there is a range of choices for the district court, and so long as its decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." *United States v. Jordan,* F.3d 1239, 1249 (11th Cir. 2009).

A sentencing court, then, has not only the power but also the responsibility, to mold an appropriate sentence-taking each and every defendant into account as an individual. The sentencing decisions made by the Court trump the sentencing guidelines.

**B.     The § 3553 Factors Applied to Mr. Hilario-Rodriguez's Case**

The goal of sentencing is to impose the least onerous sentence consistent with the purposes of sentencing, which Congress has identified as punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (providing that a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing).

To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range but also the facts of the specific case through the lends of seven factors, including:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed—
    a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    b. To afford adequate deterrence to criminal conduct;
    c. To protect the public from further crimes of the defendant; and
    d. To provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) The kinds of sentences available;
(4) The kinds of sentence and the sentencing range established…;
(5) Any pertinent [Sentencing Commission} policy statement…;
(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) The need to provide restitution to any victims of the offense.

Against this backdrop of factors, a variance based on the § 3553(a) factors are warranted in Mr. Abbas' case.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

Although Mr. Hilario-Rodriguez's crimes are serious, there are many mitigating factors attendant to these particular circumstances. Mr. Hilario-Rodriguez knew the first time he was detained by law enforcement he made a mistake. He has always been candid, honest, and forthright with all law enforcement and federal agents. He gave a post-*Miranda* statement admitting his full participation in this conspiracy. This statement was recorded. After being arrested and charged, Mr. Hilario-Rodriguez continues to cooperate with law enforcement. He has met with them three (3) times

The history and characteristics of Mr. Hilario-Rodriguez also establish the appropriateness of a downward variance. He is a person with very little criminal history. He is a loving son; husband, and father of two (2).

In addition, this court should consider the defendant's remorse as expressed through his immediate cooperation with authorities, quick plea of guilty, and cooperation with Federal agents by meeting with them three (3) separate times reviewing videos, and photographs, and assisting law enforcement in the identification of others who are "higher up" in this criminal line of work.

    **2.**    **The Need for the Sentence Imposed**

    *a-b.*    *to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct,*

Mr. Hilario-Rodriguez knows this is a serious breach of the law. He has been in jail the entire time since his arrest. Since in jail he has done nothing but continue to better himself. He has completed just about every program that is offered within the jail, from drug addiction to anger management, to parenting courses, to conflict resolution. Mr. Hilario-Rodriguez has been aware of his mother, whom he used to talk to every day. He has been away from his wife, and his two (2) children, one of whom lived with him and the other who lived in the same city.

Mr. Hilario-Rodriguez knows he wasted an opportunity and was not strong enough to capitalize on the opportunities, freedoms, and privileges of the United States of America. He knew he needed more guidance, which he lacked from his missing father, as well as maturity and education. This is why Mr. Hilario-Rodriguez dove headfirst into all of these classes and programs offered within the jail.

Mr. Hilario-Rodriguez knows his poor choices stem from looking for an easier way to provide financially for his family and are his fault. He knows that he has lost time in jail; time from his family; time from his loved ones; time from education; and time from all he holds sacred. Mr. Hilario-Rodriguez realizes he must return home and may be deported being he is not an American citizen. If deported, he is willing to pay for the transportation himself. Mr. Hilario-Rodriguez poses no risk to the public, which itself has certainly been generally deterred from engaging in similar conduct.

      ***c.***      ***to protect the public from further crimes of the defendant;***

The need to protect the public from the future crimes of the defendant is less of a concern here as Mr. Hilario-Rodriguez poses a low risk of recidivism based on his family support and deportation.  Mr. Hilario-Rodriguez as of now, will probably be deported being he is not an American citizen.   He understands the privileges of being in America; and knows he lost that privilege for now and possibly for a great extended period.

Further, Mr. Hilario-Rodriguez has been incarcerated in the Hernando County Jail since March 22, 2023. He was originally arrested in Ohio on or about March 3, 2023.  He has been in custody for approximately 391 days by the time of sentencing.  He knows he will be sent to prison for these crimes and accepts responsibility for his portion of what he did in this conspiracy.  Mr. Hilario-Rodriguez knows he will probably return to the Dominican Republic.  There, he will not have the privileges, choices, and freedom he would in America.  Mr. Hilario-Rodriguez knows his dumb decisions have cost him this privilege.

      ***d.***      ***to provide the defendant with needed educational and vocational training, medical care or other correctional treatment in the most effective manner.***

Mr. Hilario-Rodriguez respectfully submits that this factor may be applicable in his case about his education.  He has a G.E.D.  Mr. Hilario-Rodriguez speaks some English but could benefit extensively from additional English classes. Further, Mr. Hilario-Rodriguez is only partially complete in receiving his Barber license.  Mr. Hilario-Rodriguez needs additional education.

3. *The Kinds of Sentences Available*

Mr. Hilario-Rodriguez understands his sentence will result in him being sent to prison. In light of Mr. Hilario-Rodriguez's significant employment, remorse, cooperation, and other factors, Mr. Hilario-Rodriguez asks for lenience in the prison term. Mr. Hilario-Rodriguez also requests his sentencing be reduced and he is immediately deported back to the Dominican Republic.

4-5. *The Kinds of Sentence and the Guidelines Sentencing Range Established and any Pertinent Sentencing Commission Policy Statements*

Although the impact of the guidelines on a court's sentencing discretion has been discussed in Sections I and II (A), *supra*, the critical question in Mr. Abbas' case is the exact weight this Court should give to the Guidelines. As recognized in *Gall*, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49; *Rita*, 551 U.S. at 351 ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.") Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all, but the most unusual cases are now potentially relevant in every case.

Accordingly, this Court can consider several factors in determining Mr. Hilario-Rodriguez's sentence. Since the time of his arrest, Mr. Hilario-Rodriguez has accepted responsibility for his conduct and cooperated with authorities. Additionally, we ask the Court to consider Mr. Hilario-Rodriguez's commitment to self-improvement since his arrest; he attended and completed several closes while in custody. He has a consistent work history and a strong support system in the community, as evidenced by the letters that accompany this Memorandum.

Further, Mr. Hilario-Rodriguez cooperated with authorities since his arrest and remains eager to take whatever steps necessary to make amends for his mistakes. In considering the information provided the information provided in the pre-sentence investigation report, the letters of support provided with the Memorandum, and the fact that Mr. Hilario-Rodriguez has very little prior criminal history, it is evident his conduct was a one-time isolated event.

### 6. *The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

Prior to the promulgation of the Guidelines, disparity in sentencing was common. *Mistretta v. United States,* 488 U.S. 361, 365 (1989). The Guidelines were designed, in part, to remedy this disparity. "Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances." *United States v. Daas*, 198 F.3d 1167, 1180-81 (9th Cir. 1999).

In this case, the co-defendant Mr. Saleh (Case No. 8:23-cr-246-KKM-SPF). Mr. Saleh was charged with the following two counts: Conspiracy to Possess Firearms in Furtherance of Drug Trafficking and Concealment of Money Laundering. Mr. Hilario-Rodriguez admits he has the extra charge of Aiding and Abetting the Possession of Firearms in Furtherance of a Drug Trafficking Crime. Mr. Saleh, just like Mr. Hilario-Rodriguez, immediately cooperated with law enforcement from the time of his arrest until his sentencing. Now, Mr. Saleh had no prior criminal history, while Mr. Hilario-Rodriguez had a prior conviction in 2015 (age 20) and a misdemeanor conviction in 2017 (age 23). Mr. Saleh received a 5k1 reduction from the Government for his proffers with law enforcement. At the time of the filing of this Memorandum, Mr. Hilario-Rodriguez is still waiting to possibly receive his 5k1 reduction filed by the Government. On November 30, 2023, this Court sentenced Mr. Saleh to prison for a term

of 60 months for Count I and 36 months for Count II.  These terms were to run concurrently. [2]

An appropriate resource to consider on the issue of sentencing disparity is the *U.S. Sentencing Commission Preliminary Quarterly Data Report,* 1st Quarter Release Through December 31, 2011, an excerpt of which is attached hereto as Exhibit 2.  In this publication, sentences from around the country are compared, and different variables are noted.  The need for a sentence of incarceration under the instant facts can be evaluated by comparing how similar cases have been treated in the circuit and nationally.

Table 1 reveals that of all the sentences, 44.4% of imposed sentences are below Guidelines, with 17.5% of these below Guidelines sentences being for reasons other than cooperation with the government, and 26.9% were government-sponsored.  Table 2, page 7, indicates that 26.4% of sentences imposed in the Middle District of Florida are below Guidelines levels based on *Booker*, and 17.9% are below Guidelines as a result of substantial assistance, meaning over 44% of all sentences imposed in the Middle District of Florida are at below Guidelines levels.  Moreover, as Table 5, page 13 indicates, less than half of all sentences imposed nationwide under the applicable Guideline, § 2D1.1, are sentenced in accordance with the Guidelines.  These statistics demonstrate that courts nationwide are imposing sentences below the Guidelines, and the same should be done in Mr. Hilario-Rodriguez's case.

7. **The Need to Provide Restitution to Any Victims of the Offense**

As the PSR notes, restitution is not applicable in this case.

---

[2] Mr. Hilario-Rodriguez is aware that his Count II must run consecutively.

18

## CONCLUSION

The circumstances presented in Mr. Hilario-Rodriguez's case justify a departure from the statutory minimum sentence. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3353 (a) the paramount consideration, the undersigned counsel respectfully submits that a sentence below the applicable and advisory Guideline range is appropriate in Mr. Hilario-Rodriguez's case.  Mr. Hilario-Rodriguez reiterates that since his arrest he has cooperated with law enforcement. He immediately gave a post-*Miranda* statement. He met with law enforcement 3 different times while in jail for several hours.  Mr. Hilario-Rodriguez has attempted to better himself by attending and completing numerous classes while in jail.  With these factors in mind, we submit that a sentence within the guideline range is far greater than necessary to fulfill the purposes outlined in 18 U.S.C. 3553(a), and respectfully request that this Court consider a sentencing range below the applicable guidelines. In accordance with paragraph eight (8) of the plea agreement, we further request that sentences for Counts I and III run concurrently.  Also, Defendant wishes to reserve any rights under the First Step Act pursuant to 18 U.S.C. 924 (C).  [3]Finally, the defense requests that any sentence of incarceration be served at FCI Fort Dix in New Jersey, or if not permissible, any federal prison in New Jersey, to permit Mr. Hilario-Rodriguez to be near family.

---

[3] Undersigned counsel believes his charge under 18 U.S.C. Chapter 44 Section 924 (C). Defendant wishes this request to be placed into the Memorandum. Undersigned counsel asserts this may be a disqualifying offense.

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on March 27, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/CEF system which will send a notice of electronic filing to the following: AUSA Daniel Baeza.

*Jaime J. Garcia III*_____
JAIME J. GARCIA, III, ESQUIRE
Garcia Law Group, P.A.
3105 W. Azeele Street
Tampa, Florida 33609
Telephone: (813) 870-1222
Facsimile: (813) 870-1212
Florida Bar Number 0017829
Attorney for Defendant
E-Mail: jgarcia@flglawgroup.com
Legalassistant@flglawgroup.com

*Attorney for Defendant*